While you're coming up, I'll just ask, we of course have a motion to dismiss the Endangered Species Action portion of the case. My understanding is that the Forest Service agrees, Alliance for Wild Rockies agrees, but I'm not sure that everybody has agreed. Is that correct? Who, you disagree? Yes, Your Honor, our counsel for the intervener, we agree with the dismissal. What our position is is that once the claim is dismissed, the court should not vacate, but that portion should be left to the district court to dismiss. Oh, I see. So you're not objecting to our not arguing it today. You're just saying that when we act on this, we simply direct the district court to dismiss it. Is that correct? Direct the district court to dismiss it and then weigh whether it occurs appropriately. Okay. All right. This is Claudia Newman for the appellants. We object to the court ruling on the mootness claim unless the court, this court vacates the lower court decision on the ESA issue. It sounds like you all want to have argument on the ESA because everybody is not in agreement on this thing. No, I think we all agree it's moot, and I don't think argument today is necessary, but the disagreement is over whether the district court, this court should vacate the decision of the district court. That's the dispute that's still in play. On the because it's moot, should this court vacate the lower court's decision? As to that portion. Right. Okay. Thank you very much. Thank you. May it please the court. My name is Claudia Newman. I represent the appellants, Alliance for the Wild Rockies, Idaho Sporting Congress, and Native Ecosystems Council. I will reserve six minutes for rebuttal. I'd like to start out by addressing the primary issue in this case, which is that the Lost Creek-Boulder Creek project is inconsistent with the Payette Forest Plan. Let me just ask you something, counsel, because we're kind of, at least from my mind, we're narrowed down primarily to the MPC 5.1, 5.2 issue. If your clients had their way, what would the court do? What's the ultimate result that you are seeking? The court would reverse the district court's order on summary judgment and remand with an order to vacate the final record of decision for the Lost Creek-Boulder Creek project. And that remand would include an order directing the Forest Service to provide a 60-day notice to plaintiffs of any intent to implement the Lost Creek project. So that would be for any potential preliminary injunction motions we may file. And the Alliance requested... I'm sorry, a 60-day notice about what, did you say? 60-day notice to plaintiffs from the Forest Service of any intent to implement Lost Creek project-based actions, including timber sales or ground-disturbing activities or other actions. That's of the plan that currently exists? Right. We would want this court to give us the right to have 60-day notice before any of the projects are implemented for this project. And finally, the Alliance requested the court... Well, I've said vacate the final record of decision, but also indicate that the appellants may seek an injunction from the district court for any specific actions that are taken in the future, if necessary and appropriate at that time. So we're not seeking an injunction at this time, but only seeking an injunction if this court reverses the decision to approve the project and vacates that decision. So in other words, you're saying if we do what you want and then they disobey our order, you want a right to get an injunction. You'd have that anyway, wouldn't you? Well, we would have to prove irreparable harm and the like. But yes, I think it would be pretty straightforward. I doubt, frankly, that the Forest Service would disobey the decision being vacated in the first place. That would be done by the district court, though. Correct. We're not addressing any injunctions in this appeal at this time. We're simply requesting that the court vacate the decision... And remand and let the district court take it from there. And remand. Actually, the vacating the decision of the Lost Creek-Boulder Creek project approval would be sending it back to the Forest Service to do additional work that we're requesting, which I can also expand on if you'd like. Help me understand. I understand, you know, based on the briefing and everything that I've reviewed, that there seems to be a switch or change and replacing 5.2 with 5.1. And that seems to be sort of the main area. That is our main issue. Yeah. But it seems to be switching it from, you know, to restoration versus logging. So I'm just curious. It seems like you're the alliance for the Wild Rockies. Is that right? You're the alliance? Yes. Yes. Okay. Just help me understand. I'm just perplexed initially by that. Right. I have that same question. I understand your... And what the impact of that is. It must be something that I'm not seeing here and that maybe you're seeing. There's a lot of technical references here. There's an enormous amount of information in the record from the Alliance for Wild Rockies and the other appellants that are pointing to scientific studies, significant information demonstrating that this methodology that they're proceeding under, which is their term, by the way, is restoration. And I want to make it very clear that is their label. And a label is one thing. You can call it restoration. We have very significant controversy over whether, indeed, this is going to improve and restore the forest. There has been a priority, spatial prioritization, it's called. The wildlife conservation strategy is this idea that the Forest Service has decided to prioritize the white-headed woodpecker over other species. And coincidentally, the white-hooded woodpecker requires a very low canopy of trees. So low canopy means fewer trees. And there has been a conclusion made that more than any other species, more than the goshawk, more than all of these other species that may actually need high canopy or may need a completely different management of the forest to keep their habitat safe, the white-headed woodpecker has taken priority as a policy matter. That was a policy decision. I think I just tried to understand that maybe the jargon may be difficult to follow. Is the bottom line and the end result that there be more logging of trees under the proposed arrangement? Is that what the wording is? Yes, Your Honor. Okay, so that's the bottom line. That's the bottom line, yes. Okay. And so all you have to just show, I guess, at this point, is that the new proposal plan or project, I can't remember if there's a plan or there's a project, is not consistent with the original plan. Correct. And I compare it to zoning, for example, and I have provided you with an excerpt from the record, a map, and that is ER 167. I don't know if you have it in front of you, but it's useful because it's in color and it shows the outline of the project. And MA stands for management area, which is just the forest plan's assignment of different areas by numeric value. And the color coding inside of the project shows the management prescription categories, which are basically the closest. The courts often compare forest plans to zoning codes. And the closest thing I can say is this is zoning, like zoning, where they've assigned, for example, if you look at all of the light green in the MA-3, that is approximately 32,000 acres, and that is supposed to be managed for commodity production. It's been essentially zoned by the plan, saying this is how you must manage this part of the forest for commodity production. Will you explain something to me? Yeah. The commodity production, to me, indicates an increase or a greater emphasis on logging. Is that wrong? It is. No, Your Honor, that is not wrong. Okay, so if that's correct, but you're concerned that if you move to 5.1, there'll be more logging, you're really talking about the type of logging, right, not the fact that there will be logging. The central concern for us, and I want to point out that there is no analysis that's been done, and that is one of our main problems here. The environmental impacts, the central concern for us is the desired conditions for commodity production, the way the forest is supposed to look, the management of it is actually a higher canopy and different tree size. The desired conditions are for commodity production. Which one, 5.1 or 5.2? Yeah, there's a higher canopy. And what's important for the appellants is to see an analysis, which hasn't been done, of what are the impacts to wildlife, not just the white-headed woodpecker, but all of the wildlife, if you have a project in that area, MA3, that implements MPC 5.2, commodity production. What does that look like? Does that have a lesser environmental impact on the habitat as compared to what they're planning to do with this project, is 5.1, which is a restoration. And I know the labels are confusing, but really what matters is underlying what the plan is that they're planning to do. And we don't know which is worse or better. And in your case, I gather that because the forest plan originally contemplated these other things, it's kind of a violation of the, in quotes, general plan. Is that what you're saying? Right, and I wouldn't even say in quotes. The original 2003 plan. The 2003 plan is the law. It's like zoning. It says you must manage this area for commodity production. And this project blatantly is not doing that. And the argument is, well, the Forest Service has a right to tweak desired conditions to the extent they want. First, if you accept that argument, then you may as well throw out the whole forest plan, because what they're saying is we don't have to pay attention to the management prescription categories. How much flexibility is there? Let me just observe that. In my time on the court, there have been some horrendous forest fires that are simply not containable. And one of the problems has been that the canopies were at such a level that once you get one started, you can't stop it. And one of the reasons why people want to change it is because not just the animals are affected, but everything gets affected if you don't change it. Is it your position that because the 2003 plan does not contemplate what's involved here, if they want to change it, they need to go back and amend the plan and go through all of the environmental analysis that's required to do that? Is that right? Yes, Your Honor. I think everybody agrees that there are critical things that need to be done to preserve the forest. But right now, there are a lot of conclusions being made that what they're doing is the right thing, but they haven't done the review to substantiate that. And we disagree with their approach, but we do agree with the goal. And there's no – I know there's some de minimis flexibility, but nothing along the lines of what's talked about here, right? Right. The flexibility is the goal stays the same. So in that light green area, your goal is commodity production. You might be able to change different components of desired conditions. Those are canopy, tree size, snags. There's different components. And you might say – the Forest Service could say, well, we might go a little bit lower canopy in commodity production because we need to aim for that tree size desired condition. The end goal doesn't change. So there's a – what I'm getting at, I'm probably being a little vague, but there's a guideline. It's VEG-U01, which is really what the arguments from the federal defendants are hanging their hats on. I would say – What's the number of that guideline, please? It's – I can – let's see, VEG-U01, and I can give you an excerpt of record. Please. It's S-E-R, so supplemental excerpt of record, which is with the federal defendants' brief, and that's 155. Okay. Thank you. And it really doesn't give – when you read that language, I urge the court to read that very carefully. That language very clearly does not give the Forest Service the right for wholesale throwing out the entire MPC category. That very clearly states that the whole goal is to move all the components toward the desired condition for commodity production. There's a goal – it's like, as I go back to the zoning, there's a goal of single-family zoning, and you can't build a commercial building there. But maybe with single-family zoning, you can make tweaks, but you still have to end at the same goal. That's not a great comparison, but – Let me ask you – I wanted to ask you about the old forest issue. Right. Because it looks like they've changed the definition, from what I can tell. Yes. And I just wanted to ask you, is it enough that the definition has changed? Because it looks like under the CFR, 36 section 219.15, definition is not one of the components for which consistency is required. It seems like we would need a standard or guideline, for example, before we could find consistency. And I just wanted you to elaborate on that, if you could. The old forest is – I don't – actually, the idea that a definition is not something that you have to resolve consistency with, I'm not sure I would see that in the regulation. But setting that aside, the regulation CFR 36 219.15 states that goals, desired conditions, and objectives – the project must be consistent with the goals and objectives and desired conditions and standards and guidelines. And I would put the definition of old forest criteria as a standard or as a goal or as an objective, because it's part of the management and desired conditions. What's your best authority for that? I guess I'm just trying to – The desired condition – it's part of desired conditions because it's in Appendix A. There's ER 706 is Appendix A to the existing forest plan, the 2003 forest plan. And the definition or criteria for old forest in the current plan that applies now is in the desired conditions chapter, essentially. So it's part of the description of desired conditions. Does that answer your question? It's not a definition. It's a criteria for desired conditions. And so does that – I guess what's the effect of designating a forest as old forest? It's really – to put it simply, you're probably more familiar with the term old growth. And it's really this idea of what is old growth and what is not old growth, because there are certain expectations that you're going to preserve old growth. So how much old forest is something you want to hold on to? Because it's really, really good habitat. And so the question is, what is the policy decision criteria for determining what is old forest? What are the tree sizes? How much canopy is there? What kind of trees do you find? And the new – the Wildlife Conservation Strategy set forth this criteria that, if you recall, one of the Forest Service staffers said nothing would be called old forest under this new criteria. You know, this is not – and so what that means is, if you're saying this criteria is so difficult to meet, you're not going to have much – when you go out there to log trees and you say, is this old forest or not, you're going to more often have the answer, no, it's not old forest. So you can log these trees. One thing I am interested in, and ultimately it has to go back to a reevaluation, but they're talking about decommissioning a whole lot of logging roads, which I would think would be very much in your favor. Indeed, without looking at the zoning implications, I look at this, as did my colleague apparently, and I thought, why is Alliance opposing this? This at least verbally seems to be exactly the kind of thing that they would be in favor of. Very much in favor of decommissioning roads. The law requires that the roads be decommissioned, and the law requires not just that you go from 470 and then 401 and say, yay, for us, we decommissioned 69 miles of road. That's not what you do. What you do instead is you look at what's the minimum amount of road we need and to have the least environmental impact. And so if the minimal amount of road that you need is 300 or actually 200 miles, then you shouldn't be celebrating staking with 400 miles. Assuming for a minute they had followed the proper procedure from your perspective, they decommissioned a lot of roads but not enough. They need to be doing more. Yes, Your Honor. According to the law. This isn't our opinion. This is what the law requires. I've kind of lost track. You've got a minute and 37 seconds. If you want to save it for rebuttal, you can certainly do that. Well, I thought I had. Thank you, Your Honor. Good morning. Are you gentlemen going to split time? Yes. How do you want to try that? May it please the Court. I'm Alan Brabender with the Department of Justice here on behalf of the Forest Service. With me at counsel table is Lawson Fite. He represents the interveners. We will be splitting time 15 minutes for myself, 5 minutes for Mr. Fite. Okay. I'll try to help you. But as you've seen, if you watched this morning, you know how quickly it goes and how easy it is to be disoriented. Right. The Lost Creek-Boulder Creek project is a good project that will enhance the Payette National Forest. Let me ask you, it seems like you just sort of do the switch of 5.2 to 5.1, and there's not a whole lot of explanation about it other than we can do this and it's outside the scope. Can you talk to me a little bit about that? Yes. This is exactly what the Forest Plan contemplates. And let's go through the Forest Plan and the various Forest Plan provisions. And you're talking about the 2003 plan when you say that. The 2003 Forest Plan. First of all, what the Forest Service did is use desired conditions for 5.1 and 5.2 lands. And this is contemplated by the Forest Plan itself. I would ask the Court to turn to page 425. Is it ER or SER? Supplemental excerpts of record. And we see that the achievement of desired conditions are stated as long-term aspirational goals that the Forest Service should work towards over a period of decades. It goes on to state that the current conditions deviate strongly from desired conditions and that the plan merely offers guidance on how to consider desired conditions. So these numbers in the default tables are guidance. Counsel, with respect, we face this in all different areas of our court role. How high of an altitude do you look at things? As an aspirational matter, of course, you're undoubtedly right. But your opponent has made the point that the guts of the plan contain certain areas that are designated 5.1, others 5.2. And each of those has consequence. Well, let's talk about those. And you need to follow certain procedures if you're going to change that. The alliance is misstating the Forest Plan. And I want to go through the different provisions so the Court understands. Okay. If the Court also turns to page 153 of the supplemental excerpts of record, it notes again that the Appendix A, these desired conditions, represent default ranges that may be adjusted based on new scientific information on historical conditions. That is exactly what the Forest Service is doing here. There is science that shows there is much less low to mid-elevation ponderosa pine habitat as compared to historic conditions. You're saying that based upon that Appendix A, that if you have new scientific information, that you could make an extensive alteration in the plan itself without more? Well, it's important to note that these desired conditions, as we saw at page 425, are just guidelines. Right. They're aspirational goals. They're not meant to be binding. And what 425 goes on to say is that there may be exceptions to desired conditions that may occur as a result of management direction in other resource areas.  But 425 goes on to say oftentimes management area direction may have different or overriding goals, competing goals. And 425 goes on to say all of these competing goals, all of this information, needs to be considered when we design our projects. The desired conditions are general conditions that can be modified at the project level based on site-specific conditions. So let's turn to the management area direction in the forest plan for management area 3, which is the only management area at issue that has 5.2 lands. And in particular, if the court looks at page 254 of the supplemental excerpts of record, you'll see the standards and guidelines for 5.2 lands. And the court will notice that the only standard that pertains to 5.2 lands pertains to wildfire. The forest is required to suppress wildfire in 5.2 lands. You'll also notice a couple of guidelines at page 254 that also pertain to fire. But what the court will notice is there are no standards and there are no guidelines that pertain to wildlife or to vegetation. And this is important because only standards are binding limitations on the forest. Desired conditions are long-term aspirational goals that are not binding on the forest. If the court turns back one more page to page 253 of the supplemental excerpts of record, you'll see the very first sentence there says that in addition to these specific standards and guidelines for management area 3, the Forest Service needs to also consider forest-wide goals. So let's look at the forest-wide goals. And in particular, if the court looks at page 154 of the supplemental excerpts of record, and this is the forest-wide management direction for vegetation at page 154 of the supplemental excerpts of record. Vegetation goal number one instructs the Forest Service to maintain desired conditions for plant communities in Appendix A. So this is where the goal to follow desired conditions in Appendix A comes from. But notice it's listed as a goal, not a standard and not a guideline. But it's only one of many, many goals the Forest Service must consider when planning a project. I would also urge the court to look at vegetation goals number four, number five, and number six. Vegetation goal number four instructs the Forest Service to maintain or restore distribution and abundance of habitat. That would contribute to the viability of wildlife populations. You mentioned MA3 is the only one. Isn't MA5 also affected? It does not have any 5.2 lands. Only management area 3 has 5.2 lands. If we focus on the standard, isn't there a loss of the fire standards 0312 and 0515 by switching from the 5.2 to 5.1? No, this will make the project area more resilient to wildfire in the future because it is aiming for fewer trees but larger trees and less canopy. And because there are fewer trees, there's less competition among the remaining trees for sunlight, for nutrients, for water. It allows these remaining trees to grow bigger. But you're saying that those standards are not lost. Correct. And the court, I would refer the court to page 1606, 1607, and 1608, which talks about reducing the risk of disturbance events in 5.2 areas. What's your best statement regarding consistency, though? Because it seems like you have to show that this plan is consistent, right? This project, I'm sorry, is consistent with the original plan. And, you know, just assuming away the 5.2 seems rather traumatic. No. And perhaps, you know, scrutinizing it, an end run around the failed project that had occurred previously in 2011. And so I'm just trying to figure out where's your best statement regarding consistency? You're pointing to different, you know, excerpts of records here. But from what I saw, it looked like at SER 345, when you talk about MPC 5.2, you simply state it's outside the scope of the project. And then you make a reference at ER 190 that the FEIS utilizes desired conditions for MPC 1.1 in lieu of those of MPC 5.2 when differences exist. Right, because those desired conditions per the forest plan are not binding. They're just guidelines. They can be adjusted at the project level. This is what the forest plan contemplates. And I was explaining that the forest plan contains a number of goals that need to be considered, not only vegetation goal number one, which pertains to Appendix A, but also vegetation goals number four, five, and six. Counsel, let me just ask you this. I've only been on the court 11 1⁄2 years, but I've handled a lot of environmental cases. And I don't ever remember seeing a case where the Forest Service has, in effect, rewritten based upon aspirational goals some parts of the plan that are, you know, almost basically agreed to and part of the original plan. Can you point me to any case that did what you're asking us to do in this case? No, but I can tell you the forest plan is this is exactly what the forest plan implies. Respectfully, I understand that. I know about the National Forest Management Act. But as opposing counsel indicates, my understanding has been basically this is like a general plan, and the general plan has certain things that you can do. There's certain flexibility. But some things you can't do without amending the plan, which all that includes. And it sounds like you're moving the requirements of subsections around on casters or you're rolling around on roller skates to decide whatever you want to do, and there's no set rule. And that's why I ask you, is there a case? I've never heard of a case that allows you to do that kind of thing. Well, this is, again, exactly what the plan. No, no, I understand. That's your perspective. Right. I'm saying if that's so clear, show me the case where a court of appeal has said, you know, you're right. That's exactly the way this is supposed to work. Well, maybe no other plaintiff has challenged it because what, again, is going on here is exactly what the plan. Believe me, everything's been challenged. Exactly what the plan contemplates. Not only does the Forest Service need to consider the other competing vegetation goals, but also the wildlife goals. We can look at those as well. Supplemental excerpts of record, page 149. And wildlife goal number one instructs the Forest Service to provide habitat capable of supporting viable populations of species. Wildlife goal number four instructs the Forest Service to provide habitat that will keep Region 4 sensitive species from becoming listed. And the white-headed woodpecker is a Region 4 sensitive species. The Forest Service has to consider its welfare when planning projects. Well, let me ask you this, counsel. Let's just say hypothetically that there was in one of these aspirational areas something that says, you know, it's the highest goal of the Forest Service to, you know, protect this certain kind of woodpecker. But within a particular subpart of a forest plan, it says specifically that areas, you know, from this location to this location down to this location is a critical protected habitat for this kind of woodpecker. Would you, based upon your aspirational goals and the view of department scientists, be able to change the geographic location of the habitat just based upon your internal decision? You know, I think we got that wrong. Let's just change it. Well, a forest plan contains a variety of different kinds of provisions. Oh, yeah. Standards and objectives to goals and guidelines. And the Forest Service has the discretion on how to implement long-term aspirational goals. There's nothing binding. As long as they don't run in the face of express stated law and provisions of the plan that say you've got to do X. That's right. And this plan does not say that. Your opponents say otherwise. They say that the plan says X, Y, and Z. And you're saying, I don't care. The aspirational goals say we can change that. That's really what this case is all about, I think. Right. And, again, I sound like a broken record here, but this is exactly what the forest plan contemplates. Is that the desire? That's an eye of the beholder. Let me ask you about the old forest habitat because you argue, as I pointed out previously, that the definition of old forest habitat in the project, the final EIS, is the same as the definition of old forest in the 2003 plan. That's correct. But under the project FEIS, there's no forest that meets the definition of old forest. That's at ER 215. And it looks like your own employee, Mr. Klassner, pointed this out in an e-mail as a potential problem. I mean, clearly something is not right. It's different. How much old forest habitat existed previously and why is there no old forest under the project? Let me explain. Okay. If you have any case law in your explanation, I'd like to see it here. I do not believe there is any case law. Okay. Then let me hear your explanation. There are record explanations. Certainly what the plan contains is a narrative definition of old forest. It defines old forest as generally having certain characteristics, such as large trees, large snags, and abundance of coarse woody debris. That definition is at page 622 of the supplemental excerpts of record. Now, the proposed plan amendments contains the exact same narrative definition, and that can be found at page 661. What the proposed amendments, what they do is they add some quantitative criteria under which, for example, a large snag is considered to be more than 20 inches in diameter. So what the Forest Service is doing is using this sort of criteria as background to flesh out the plan's narrative definition. And it's really an application of the best available science because that's what that criteria summarizes. The criteria in the Appendix E of the proposed amendments is from the Wisdom 2000 study and from the Hahn 1997 study, as explained in Appendix E. So, and there's nothing wrong, there's nothing inconsistent with the forest plan in using this sort of quantitative criteria to flesh out a narrative definition. Now, in the larger picture, I think your opponent took issue with describing the changes as restoration. What do you really want to achieve by this change? So what the Forest Service is aiming to do is to restore habitat for family one species represented by white-headed woodpeckers. So the Forest Service is aiming for fewer trees but larger trees and less canopy because that's the type of habitat used by white-headed woodpeckers. I think your co-counsel would like to come up and speak. He's anxious. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Lawson Fite here on behalf of Adams County, Idaho and the Payette Forest Coalition. And I want to emphasize at the outset that a really broad coalition came together to support this project. It includes conservation groups, local governments, and industry. If you look at ISER pages 33 and 34, that shows the substantial and ongoing involvement of conservation groups in developing this project. And if you look on page 40 of the ISER, that also talks about the coalition's bylaws and how the coalition is an open and transparent process. And nonmembers, even the appellants, if they had desired to, would have been welcome to attend, but they chose not to. Mr. Counsel, I, for one, applaud the fact that you've got a bunch of people together trying to make this work. I've seen it in some other circumstances, and that's important to the Court. But you still have to comply with the law. And did anybody in your coalition meetings talk about anything more than, you know, working within the existing plan? In other words, a need for perhaps a new EIS, an amendment to the plan. Anybody talk about that? I think your question, Your Honor, really goes back to, well, you know, everyone gets together, but, you know, you still have to comply with the law. Certainly. But I want to touch on the NFMA issues. There are three types of forest plan direction. There's standards, guidelines, and desired condition. And standards and guidelines are both recognized as binding. Desired condition is the aspirational goal of that. Well, let me just comment. You know, goals of any nature are still subordinate to the express requirements of the plan with respect to particular geographic areas, are they not? They are. I want to make one side point there, which is this project does not change any element of the forest plan. It does not preclude any further management. And the Forest Service ñ Well, wait a minute. I perhaps misunderstood, but I thought your opponent was saying that canopy, for example, is one of the issues, was going to be changed substantially. They're concerned about a particular kind of bird that does well, I think she said, with a high canopy, not with a low canopy, and you got a different result in 5.1 and 5.2. Is that correct? In the short term, there will be less canopy cover. Short term meaning what, 25 years? I would say more. We're talking about trees here. Right, right. There will be removal of smaller trees, and the largest of the large will remain. The large trees will be enhanced. They'll be given more space to grow, and then an understory will fill in. You cite to Mr. Klausner's white paper when you're talking about these short-term tradeoffs. But the white paper states that the change won't preclude achievement of the plan's desired conditions in the long term. But Mr. Klausner seems to suggest, from my reading of this, that there would have to be another agency decision to return back to the plan's desired conditions. And I don't see any, as my colleague here has pointed out, I don't see any time limit on this project. And there's no guarantee that the agency would go back to the plan's desired conditions. That's a good question, Judge Merguia. And if you look at the final page of the Record of Decision, it's a 10-year project, except for the prescribed fire conditions. And so longer term, after 10 years, we'll see what happens. I think that white paper that you referred to is really important because it talks about standards and guidelines for – or the desired – sorry – desired condition for large tree – amount of large trees and canopy cover. And if you look at – if you analyze it with a 5.2 lens versus 5.1, you have to make a tradeoff between the amount of large trees. You can either move toward the composition of large trees that you want or move toward the type of canopy cover that you want. And what the Forest Service did, using its flexibility under the VEG U01 standard, is we are in the short term going to move away from canopy cover, and we're going to prioritize the large tree component of 5.2. Let me – before we – unfortunately, we're out of time. But let me just ask you one question before we end. Do you know of any case that allows the Forest Service and any coalition to do what you propose to do here? I have not seen a case that rests on consistency with desired condition. No NIFMA case has ever invalidated, as far as I know, a project on the basis of an inconsistency with the desired condition, particularly where the forest plan has the flexibility that we see here. Okay. Thank you. I believe you have some rebuttal time, counsel. Thank you. The main point here is that that entire area on the map under the forest plan is supposed to be managed for commodity production. The whole purpose of a forest plan, what a forest plan is, is directing the Forest Service how to manage the forest. That's what it's about. And so the forest plan here, the payout forest plan, says we want these 32,000 acres to be managed for commodity production. That's MPC 5.2. This project is going to manage that entire area with the goal of restoration and maintenance, a completely different goal. You may as well just throw out the entire forest plan. If the court upholds this decision and says that the Forest Service can just ignore the direction of how, what the ultimate management requirement is for an entire part of the forest, why have the plan at all? Let me ask you, counsel, the same question but coming at it a different way. Do you know of any case law that would bar what they want to do? No, I don't, Your Honor. But, you know, to actually switch the answer that they gave you, no plaintiff has challenged this, was what you heard. I would say this is so egregious. Sometimes there are things that there's no case law because it hasn't been done because it's so obviously illegal. And I think here the idea that the Forest Service would actually implement a project that's completely opposite of what the forest plan is directing is so egregious that it hasn't been seen. So as you view it, the question is really not a factual question whether or not it's inconsistent with the plan. The question is whether they have the authority to implement the changes which are inconsistent with the plan. Actually, Your Honor, the first, what you said first, this is inconsistent with the plan, what they're doing, because they are going to manage 32,000 acres of forest. So if we accept that, then the second question is do they have authority to implement these changes which are inconsistent with the plan? I assume you're going to say no. Well, they do, but the way they do that is amend the forest plan. Amend the plan, but not while the plan is in place. You know, restoration, if it's the right direction to go, then amend the plan, and then we move forward with this project. So once you show inconsistency, you win. Right. And once they, I mean, the amendment of the plan would give the appellants the opportunity to discuss the issues that matter to us and let, you know, if they're right, they're right. If we're right, that's a different issue, whether this is the right approach. Before you leave, I just wanted to, is MA-5 not affected? Correct. Yes, Your Honor. MA-5 only because there's no MPC 5.2 in MA-5. There may be, there's so, let's see, I'm trying to think. I didn't see anything that stood out to me. That doesn't mean it doesn't exist as far as inconsistencies with the forest plan in MA-5. All right. Thank you. Thanks to all counsel for your argument. The case is submitted and the Court stands adjourned.
judges: M. Smith, Murguia, Robreno